UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

SAMUEL MUKASA,

    Plaintiff,

vs.                                     CASE NO.: 1:98cv114-SPM

SHANDS TEACHING HOSPITAL
& CLINICS, INC.,

    Defendant.
_____/

## ORDER DENYING MOTION FOR SUMMARY JUDGMENT

THIS CAUSE comes before the Court on Defendant's motion for summary judgment (docs. 31, 32, 33, 43) and Plaintiff's response (docs. 40, 41, 44). For the reasons explained below, the motion for summary judgment is denied.

## I. Background

Plaintiff, Samuel H. Mukasa, is a black male of Ugandan national origin. He is a naturalized citizen of the United States. Pursuant to Title VII of the Civil Rights Act of 1964, as amended,[1] Plaintiff is suing Shands Teaching Hospital and Clinics, Inc., his former employer, for discrimination on the basis of race,

---

[1] 42 U.S.C. §§ 2000e et. seq., and 42 U.S.C. § 1981(a).

color and national origin.[2] Specifically, Plaintiff complains that he was placed on a discriminatory performance-improvement plan which ultimately effected his resignation by constructive discharge. The facts leading up to Plaintiff's resignation, with all reasonable inferences drawn in the light most favorable to Plaintiff, are as follows.

Plaintiff was employed as a medical technician at the Shands blood bank[3] for approximately 10 ½ years from January 1986 until October 4, 1996. During his employment with the blood bank, he worked for four different supervisors. All four noted that Plaintiff frequently made clerical and technical errors in his work.

The errors were graded under a Quality Assurance (QA) evaluation system that was highly subjective and difficult to implement with consistency. Under the QA system, some blood bank employees felt that the decision to document and grade errors was frequently based on who made the error instead of the seriousness of the error.

For instance, favored white employees, it was felt, were less likely to be written up for errors and their errors were usually graded less severely. These

---

[2]Plaintiff clarified in the Pretrial Stipulation that he is not pursuing a claim under a retaliation theory. See Pretrial Stipulation (doc. 48) at Section VIII, number 2.

[3]The Shands blood bank is a department of Defendant Shands Teaching Hospital and Clinics, Inc. The blood bank is responsible for testing, classifying, and distributing blood products to the various other departments of Defendant Shands as needed.

favored employees also aimed to have other members of the staff written up for errors, while their own errors were covered up by supervisors.

In April of 1994, Plaintiff's third supervisor, Linda Orsini, terminated Plaintiff after Plaintiff and one of the favored employees, Traci Pena, had an argument. After the argument both Plaintiff and Ms. Pena claimed to have been pushed by the other and each filed sworn criminal complaints against each other. Ms. Pena was not terminated for the incident, but Plaintiff was.

Plaintiff successfully challenged the termination through a personnel grievance process. In support of Plaintiff's grievance, several current and former employees of the blood bank wrote letters voicing concerns about what they perceived to be systematic, unfair treatment of Plaintiff. In August of 1994, Plaintiff's punishment for the incident was reduced to a three-day suspension without pay. He was given back pay and his benefits were reinstated.

In recommending that Plaintiff be reinstated, the grievance panel noted that although Plaintiff did not behave appropriately when dealing with Ms. Pena, management at the blood bank needed to take some of the responsibility for the incident which was brought on, in part, by poor supervision and failure to address employees' issues. Plaintiff's supervisor, Linda Orsini took a voluntary demotion in May of 1994 during the pendency of Plaintiff's grievance. She stepped one level down the supervisory chain from director of the blood bank to technical supervisor.

When Plaintiff returned to work after his reinstatement, Belinda Scott replaced Linda Orsini as the director of the blood bank. Linda Orsini, however, continued to make Plaintiff's QA evaluations which are at issue in this case.

In April of 1996, the new director of the blood bank, Belinda Scott, placed Plaintiff on a performance-improvement plan because of her concern about the errors being made by Plaintiff. Such errors included failing to or improperly recording and interpreting blood test results and failing to perform assigned monthly quality control and maintenance. Under the terms of the plan, Plaintiff was required to work under direct supervision. He was required to ask permission before leaving his work area to take short breaks. He was asked to stop taking short dinner breaks with his co-workers. He was not allowed to work on emergency requests from doctors without prior management approval. No other blood bank employee had ever been placed on a performance-improvement plan with such onerous conditions. It appeared that Plaintiff was unfairly singled-out and persecuted.

Once Plaintiff was placed on the plan, all of his errors were subject to immediate QA documentation, whereas other employees' errors were first checked by co-workers and corrected beforehand. Plaintiff alleges that while he was on the plan, his errors continued to be graded more severely than similar errors made by others at the blood bank. He was also written up for these errors more frequently.

Plaintiff's error record did not improve after his placement on the performance improvement plan. So on June 27, 1996, Plaintiff was issued a second corrective action in the form of a three-day suspension without pay. A third corrective action would have resulted in termination.

About this same time in June of 1996, Shands laboratories, including the blood bank, began preparations for a series of economically driven layoffs or reductions in force. Before these layoffs were formally implemented, Shands offered to accept volunteers for layoff and offered to provide those volunteers the same severance package that applied for those who were forcibly laid off. The severance package consisted of one week's pay at the employee's regular pay rate for every completed six months of employment with Shands, in addition to either one month of notice or pay. For Plaintiff, the severance package would have totaled $18,290.67.

Although Plaintiff had enough seniority to prevent him from being selected for layoff, Plaintiff volunteered for it. He changed his mind, however, when he was asked to sign a release as a condition of receiving his severance pay. Pursuant to Plaintiff's refusal to sign the release, Plaintiff was removed from the voluntary layoff list and continued to work at the blood bank, under the performance improvement plan, until October 4, 1996 when he resigned. On October 4, 1996, Plaintiff filed a charge of discrimination with the Florida Commission on Human Relations, from which this action ensued.

## II. Discussion

### A.     Prima Facie Case

Plaintiff concedes that he has no direct evidence of discrimination. To prove a *prima facie case*, Plaintiff must therefore rely upon the indirect method established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under the McDonnell Douglas framework, Plaintiff has the burden to show by a preponderance of the evidence that: (1) he is a member of a protected class; (2) he was subject to an adverse job action; (3) similarly situated employees were treated more favorably, and (4) he was qualified for the job. See Holified v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). It is undisputed that Defendant has met the first two elements of the *prima facie* case. Defendant contends, however, that Plaintiff cannot meet the third and fourth elements.

#### 1.     Treatment of Similarly Situated Employees

With respect to the third element, regarding the treatment of similarly situated employees, Plaintiff has met his burden by citing to several instances where Plaintiff was graded or punished more severely than white employees who made the same error. For example, on two separate occasions, white employees left test tubes in the centrifuge and were not cited at all for the error. When Plaintiff made the same error, Plaintiff was cited with a "2B" error. When two white employees set up patients requiring an Rh negative platelet product with a mislabeled Rh positive product, one employee was cited with a "2A" error

and one employee was not cited at all. When Plaintiff made the same error, he was cited with a "2B" error. When two white employees made a computer error by generating a negative DAT result, they were each cited with a "2A" error. When Plaintiff made the same mistake, he was cited with a "2B" error. When a white employee failed to document the results of a sickle cell test according to Quality Control Standard Operating Procedure, no official action was taken. When Plaintiff made the same error on two separate occasions, he was cited twice for a "2B" error.

Defendant argues that the comparisons presented by Plaintiff are not valid because the errors may have occurred at different times, before April 1996 and after, when different QA evaluation systems were in place. This argument is unavailing, however, because Plaintiff has shown that the QA system remained essentially the same over time.

Under both systems, four different grades are assigned to reflect the seriousness of errors. The grading system in use prior to April of 1996 graded errors on a scale of 1A, 2A, 2B and 3. Afterwards, a scale of 1-4 was used. Under the two grading systems, the new "1" or old "1A" designates an error that poses no potential harm to the patient. The new "2" or old "2A" designates an error that has the potential for minor harm to the patient. The new "3" or old "2B" designates an error that is potentially harmful to the patient. The new "4" or old "3" designates an error that is a real danger to the patient. Given the correlation

of the grades under the two systems, workable comparisons can be made. Defendant has not convincingly argued that they cannot.

Defendant also argues that Plaintiff cannot show he is similarly situated to other employees because no other employee made as many errors as Plaintiff. However, by citing to instances where Plaintiff was cited with error when other employees were not, Plaintiff makes a convincing argument that because of discrimination in the QA system, his recorded errors were overstated compared to his co-workers'. Plaintiff also cites to one co-worker, Donna Godwin, who was cited for making almost as many errors as Plaintiff. Ms. Godwin, however, received more favorable treatment than Plaintiff did.

Although Ms. Godwin was also placed on a performance improvement plan, her placement occurred only after Plaintiff complained about being singled-out for punishment. Furthermore, under her plan, Ms. Godwin had less restrictions placed upon her than Plaintiff had. For example, unlike Plaintiff, Ms. Godwin was never subjected to a suspension without pay even though she continued to make errors after being placed on the plan. Ms. Godwin was not required to work under direct supervision, was not required to ask permission to leave her work area for short breaks, and was not asked to stop taking short dinner breaks with her co-workers. Also, unlike Plaintiff, Ms. Godwin was allowed to continue taking emergency requests from doctors without seeking prior approval from management. Once Plaintiff resigned from the blood bank,

the performance improvement plan was immediately lifted from Ms. Godwin.

Plaintiff has sufficiently shown, for purposes of making a *prima facie* case, that similarly situated employees were treated more favorably than he was. Accordingly, Defendant's motion for summary judgment as to this ground is denied.

### 2. Qualified for Job

With respect to the fourth element, regarding Plaintiff's qualification for his job, Plaintiff has met his burden. Plaintiff was licensed by the State of Florida to perform as a medical technician and was in fact doing so as an employee of the Shands blood bank for 10 ½ years. While Plaintiff's performance may not have been of consistent quality, Defendant did not formally terminate Plaintiff from his position. It appears, therefore, that Plaintiff was qualified for the position. Plaintiff has met his burden to establish his qualification for the job as part of his *prima facie* case. Accordingly, Defendant's motion as to this ground is denied.

### B. Legitimate Non-Discriminatory Reason

Because Plaintiff has established a *prima facie* case under the McDonnell Douglas framework, a legal presumption of discrimination arises and the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for its treatment of Plaintiff. See Schoenfeld v. Babbitt, 168 F.3d 1257, 1269 (11th Cir. 1999) Upon the proffer by Defendant of a legitimate, non-discriminatory reason, the legal presumption of discrimination disappears and the burden shifts back to

Plaintiff to present evidence sufficient to show that there are genuine issues of material fact as to the truth or falsity of Defendant's proffered legitimate, non-discriminatory reasons. See id.

In this case, Defendant cites to Plaintiff's QA record as a legitimate, non-discriminatory reason for placing Plaintiff upon the performance improvement plan. Defendant does not respond, however, to Plaintiff's proof regarding the more favorable treatment of similarly situated co-workers in the grading and citation of error. It is precisely because of this discrimination alleged that Plaintiff's QA record may not be a reliable indicator of Plaintiff's performance. The issue Plaintiff raises as to the validity of the QA evaluation remains as a genuine issue of material fact for trial and precludes entry of summary judgment for Defendant.

### C. Damages

Defendant argues that the damages available to Plaintiff should be limited (1) because Plaintiff voluntarily resigned from his position at the blood bank, (2) because no basis for compensatory and punitive damages has been shown, and (3) because Plaintiff improperly obtained confidential patient records.

#### 1. Resignation

Because Plaintiff resigned from his position, he cannot recover back pay, front pay, or be reinstated unless he can show that he was constructively discharged. See Nance v. Maxwell Federal Credit Union, Nos. 98-6174, 98-

6282, 1999 WL 622186, at *3 (11th Cir. Aug. 17, 1999). A constructive discharge occurs when working conditions are "so intolerable that a reasonable person in [the Plaintiff's] position would have felt compelled to resign." Poole v. Country Club of Columbus, Inc., 129 F.3d 551, 553 (11th Cir. 1997). The record in this case is sufficient to raise the issue of whether Plaintiff was constructively discharged by being singled-out and placed under strict supervision.

Defendant argues alternatively that Plaintiff was not constructively discharged because he waited too long to resign or because he should have waited even longer until his administrative charge of discrimination with the Florida Commission on Human Relations was resolved. These alternative arguments are not convincing to eliminate genuine issues of material fact concerning the alleged constructive discharge. Nor is the grievance panel opinion as to the reasonableness of the plan dispositive of this issue. Because genuine issues exist, summary judgment as to this ground is denied.

### 2. Compensatory and Punitive Damages

Defendant has not met its burden for summary judgment to demonstrate the lack of any genuine issues concerning Plaintiff's claims for compensatory and punitive damages. Because genuine issues may exist as to these matters, summary judgment on this ground is denied.

### 3. Confidential Patient Records

Defendant argues that any damages suffered by Plaintiff should end as of

May 4, 1999 because that is when Defendant discovered that Plaintiff used Defendant's supplies to copy confidential patient records for his own use. Defendant argues that this "after-acquired" evidence of Plaintiff's wrongdoing would have resulted in Plaintiff's termination and should therefore effectively limit Plaintiff's damages. See Wallace v. Dunn Constr. Co., Inc., 62 F.3d 374, 378-381.

In order to limit damages based on after-acquired evidence, Defendant must prove that the misconduct was so grave that immediate discharge would have followed in any event. See id. at 379. Defendant presents strong evidence to suggest that Plaintiff would have been fired for copying confidential patient records, but the evidence falls short of foreclosing all genuine issues as to this matter.

Defendant notes that the conduct at issue constitutes a "Group III" major violation, for which termination or a disciplinary suspension will follow according to hospital work and safety rules[4] in place at the blood bank. However, the rules provide for consideration of the incident and the employee's prior record in fashioning the appropriate response. So under the rules, the commission of a Group III major violation will not necessarily result in termination. In fact, it was a Group III major violation that Plaintiff was cited for when he successfully appealed his termination through the personnel grievance process.

---

[4]See Defendant's exhibit 19, PM 06-301.

In further support of its argument, Defendant also cites to the affidavit of Wendy Kissinger, wherein she concludes that the offense committed by Plaintiff would have resulted in immediate termination. But it is unclear whether Ms. Kissinger possess any authority over these matters and whether such authority would be final. Given Plaintiff's successful appeal of a prior termination and the lack of information concerning the disciplinary authority for the conduct at issue, an issue still exists as to whether Plaintiff would in fact have been terminated for copying the records.

The Court having found no basis upon which to grant summary judgment for Defendant in this case, it is hereby

ORDERED AND ADJUDGED that Defendant Shands's Motion for Summary Judgment is denied.

DONE AND ORDERED this 24th day of August, 1999.

Stephan P. Mickle
United States District Judge